## State of Vermont Agency of Natural Resources v. Gerard, Richard, Paul and Gaston Riendeau

[603 A.2d 360]

No. 89-570

Present: **Allen, C.J., Gibson, Dooley and Morse, JJ., and Martin, Supr. J., Specially Assigned**

Opinion Filed December 20, 1991

*Jeffrey L. Amestoy*, Attorney General, and *Mark J. Di Stefano*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Melvin D. Fink* of *Fink & Birmingham*, Ludlow, and *George E. Brooks*, Montpelier, for Defendants-Appellants.

**Dooley, J.** The Vermont Agency of Natural Resources brought this action against Gaston Riendeau and his sons Gerard, Richard and Paul, alleging that defendants had discharged "waste, substance or material" into East Branch Brook in violation of 10 V.S.A. § 1259(a). The alleged discharges occurred in connection with a logging operation defendants conducted on land they owned in the towns of Ludlow, Mount Holly and Weston. Finding that defendants had violated 10 V.S.A. § 1259(a), the trial court, under 10 V.S.A. § 1274(a), issued an injunction and ordered defendants to pay a $10,000 civil penalty and punitive damages of $5,000. Defendants appeal the monetary elements of the remedy. We affirm the civil penalty and reverse the punitive damages.

Defendants began logging on the site in question in June 1987. In August and November of 1987, an Agency investigator received complaints about mud and silt in East Branch Brook and found, on investigation, that the material was entering the brook because of defendants' logging operations. The Agency brought this action on November 6, 1987, seeking first a temporary restraining order and preliminary injunction. On that date, the court issued a consent order prohibiting any discharge of mud, silt, wastewater, petroleum products and brush into East Branch Brook.

After further proceedings, including an Agency motion for contempt, the matter came to trial in June and August of 1989. In findings issued in October 1989, the trial court found that on at least five occasions defendants caused substances to be "deposited or emitted" into East Branch Brook as a result of their logging operations. The substances involved were mud and silt, tree butts, tree stumps, and slash (branches, bark or pieces of wood). The court found that defendants did not have a discharge permit.

The court also found that defendants had violated various Acceptable Management Practices (AMPs) as defined in a rule issued by the Vermont Department of Forests, Parks and Recreation in June 1987, entitled Acceptable Management Practices for Maintaining Water Quality on Logging Jobs in Vermont. The AMPs define remedial measures needed to protect waters from the effects of logging operations. The introduction states:

> The AMPs have the force of law and violations can be costly, so it is important to understand the conditions under which they can be enforced. These conditions are as follows:
>
> 1. A violation occurs only if there is a discharge. If no discharge occurs, the logger or landowner cannot be fined or prosecuted for not having the AMP's in place.
>
> 2. If there is a discharge and the AMP's are properly in place, there is no violation.
>
> 3. If there is a discharge and the AMP's have not been followed, there is a violation.

The court found that defendants violated AMPs prohibiting dragging logs across the stream, use of hay bale erosion controls, use of culverts and installation of water bars and drainage devices. It also found some mitigating factors and that defendants spent approximately $30,000 to implement improvement practices.

Based on its findings, the court concluded that defendants had, without a permit, discharged "waste, substance or material" into state waters on at least five occasions in violation of 10 V.S.A. § 1259(a). The court declined to hold defendants in contempt for violating the preliminary injunction. It did, however, impose civil penalties of $2,000 for each of the discharge viola-

tions (totaling $10,000), and punitive damages against defendants for having "knowingly and willfully discharged substances into waters of the state."

On appeal, defendants argue: (1) the court had no authority to order payment of civil penalties under 10 V.S.A. § 1274(a) because the Agency failed to adopt rules determining which violations of law are significant; (2) civil penalties could not be imposed without a finding of harm to the environment; (3) civil penalties could not be ordered based on a violation of the AMPs; and (4) punitive damages could not be awarded without a finding of malice. We consider the issues in order.

Defendants' first argument is based on 10 V.S.A. § 1274(b), a subsection added in 1986, which states:

> (b) The [S]ecretary [of Natural Resources], by rule, shall define those violations which are significant, based upon the magnitude, duration, consequences and causes of the violation. When a significant violation occurs, the secretary may initiate proceedings to compel compliance by and seek penalties from the violator. A court, upon finding that such a violation has occurred, shall order compliance and retain jurisdiction to assure that compliance schedules are met. The court also shall impose penalties. Action under this section shall not restrict the secretary's authority to proceed under section 1267 of this title.

The statute to which the subsection was added, now § 1274(a), authorizes judicial remedies, including the levying of civil penalties, for discharges of waste in violation of the chapter. It is undisputed that the Secretary has never followed the command of § 1274(b) and promulgated rules defining significant violations. Defendants argue that this failure has stripped the court of the authority to impose civil penalties. The Legislature, they argue, by enacting § 1274(b), intended that civil penalties be imposed only for significant violations and that the Secretary's failure to define such violations makes it impossible to discern the legislative intent.

■ For three main reasons, we disagree with defendants' construction of the applicable statutes. First, our basic rules of statutory construction suggest that courts retain the power to impose civil penalties under § 1274(a) despite the enactment of

§ 1274(b). In construing a statute we must be guided by the plain meaning of the text. See *In re Graziani*, 156 Vt. 278, 282, 591 A.2d 91, 94 (1991). Section 1274(a)(6), under which the court proceeded, grants specific authority to "exercise all the plenary powers available to it in addition to the power to: . . . (6) Levy civil penalties . . . ." This grant of power was not amended when the Legislature added § 1274(b). It is inconsistent with the text to suggest that the addition of § 1274(b) impliedly revoked the powers granted by § 1274(a).

When provisions of statutes are in apparent conflict, we favor the interpretation that harmonizes the conflicting provisions. *Weissenstein v. Burlington Bd. of School Comm'rs*, 149 Vt. 288, 292, 543 A.2d 691, 693 (1988). There is a presumption against implied repeal of one statute by another. *State v. Foley*, 140 Vt. 643, 646, 443 A.2d 452, 453 (1982). The construction urged by defendants puts the subsections of § 1274 in conflict, without reconciliation, and requires that we find that the addition of subsection (b) repealed, at least in part, the authority contained in subsection (a). On the other hand, the subsections can be harmonized. Subsection (a) is phrased in terms of the court's discretionary power to grant specific relief on finding a violation of the water pollution control laws. Subsection (b) is a command, requiring the court to impose civil penalties on finding a substantial violation as defined by a rule of the Secretary. The requirement to grant specific remedies in certain circumstances under § 1274(b) does not preclude the court's continuing to grant specific relief in other circumstances under § 1274(a). As this interpretation reconciles these seemingly conflicting subsections, we adopt it.

Second, defendants' construction leads to an unreasonable result. See *Drumheller v. Shelburne Zoning Bd.*, 155 Vt. 524, 529, 586 A.2d 1150, 1152 (1990) (adopt construction that avoids unreasonable or unjust results). Section 1274(b) deals with both injunctions and penalties. Under defendants' construction, the Secretary's failure to adopt rules would mean that the court could not issue an injunction to prevent a violation of the water pollution laws. Moreover, the Secretary's failure to promulgate definitions would stop all water pollution enforcement and leave our waters exposed to degradation. We do not find that the Leg-

islature intended such extreme consequences from the Secretary's failure to act.

■ Third, we are guided by legislative history when it is available. See *In re D.P.*, 152 Vt. 184, 188, 566 A.2d 399, 401 (1989). Section 1274(b) was part of a bill, proposed by the administration, rewriting water quality laws. In testimony before the House Natural Resources & Energy Committee, then Commissioner of Water Resources, Jonathan Lash, speaking for the administration, indicated that the intent of § 1274(b), then being considered for adoption, was to require court action "which is a help in the situation . . . where the courts are sort of reluctant." Hearing before the House Natural Resources & Energy Committee on S.42, April 25, 1986, transcript at 14–15. Thus, the statute's legislative history also supports the reconciliation of the subsections of § 1274 described above.

■ For the above reasons, we hold that the enactment of § 1274(b), and the failure of the Secretary of Natural Resources to promulgate rules under that subsection, do not eliminate the discretionary power of the court to impose civil penalties under 10 V.S.A. § 1274(a)(6).

Defendants' second argument is that the court erred by imposing civil penalties without considering the harm to the environment. The court ordered defendants to pay $2000 for each of the five violations of 10 V.S.A. § 1259(a). No reason was given for the imposition of civil penalties or for the amount imposed. . Defendants argue that it is unfair to impose substantial civil penalties without a finding of environmental harm and, in any event, that such a finding is required by 10 V.S.A. § 8221(b)(6).

The statute on which defendants rely was enacted in 1989, effective no earlier than July 1, 1989, as part of an addition of a new environmental law enforcement scheme. See generally 1989, No. 98. It authorizes the Secretary to bring an action in superior court to enforce certain environmental laws. 10 V.S.A. § 8221(a). In such an action, the court can "levy a civil penalty . . . of not more that $50,000.00 . . . for each violation." 10 V.S.A. § 8221(b)(6). In fixing the amount of the penalty, the court "shall apply the criteria set forth in subsection 8010(b) of this title." *Id.* The criteria set forth in § 8010(b) include "the degree of actual or potential impact on public health, safety, welfare and

the environment resulting from the violation." It is the failure of the court to consider this factor that forms the basis of defendants' claim on appeal.

The Agency of Natural Resources responds with numerous reasons why there is no error, including the failure of defendants to raise the statute below and its inapplicability to a case filed well before it was enacted.[1] See 1 V.S.A. §§ 213, 214. We agree that the statute is inapplicable to this case. The specific list of factors to be considered in assessing civil penalties is applicable only to actions brought under § 8221(a). There is no indication that the list applies to § 1274(a) actions or that § 8221 was intended to be the exclusive statutory route for judicial environmental enforcement actions. Indeed, the failure of the Legislature to repeal § 1274 and the higher penalties available under § 8221(b)(6) belie such an interpretation.

■■ Nor do we believe that in the absence of statutory factors, the court must base imposition of civil penalties on the degree of environmental harm. The primary purpose of civil penalties is not punishment. See *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 237 (1972). Rather, these penalties serve a remedial purpose by making noncompliance at least as costly as compliance. They also reimburse the government for enforcement expenses and other costs generated by the violation. See *id.*; Selmi, *Enforcing Environmental Laws: A Look at the State Civil Penalty Statutes*, 19 Loy. L.A.L. Rev. 1279, 1296–97 (1986). Consistent with these goals, the court could impose a civil penalty even if it found little or no environmental damage.

Defendants seek to avoid this result by arguing that the violation is a mere technicality because they would have received a permit had they applied for it. There is nothing in the record to support this argument, and the substance of the AMPs suggests that the Agency would not have made lawful

---

[1] 10 V.S.A. § 8221 became effective on July 1, 1989, after the trial in this case had started. See 1989, No. 98, § 6. The section that contains the factors to be used in assessing penalties, 10 V.S.A. § 8010, did not become effective until the Secretary of Natural Resources adopted certain rules, 10 V.S.A. § 8016, and a new environmental law judge authorized by the statute was appointed. See *id.* There is nothing in the record showing when these events occurred.

the placement of waste materials into East Branch Brook. The place to make this argument, with supporting evidence, was the trial court and not here.

Defendants' third argument is that the court impermissibly ordered civil penalties based on violations of the AMPs. As set forth above, the AMPs create specific methods of complying with the law even though there is an unpermitted discharge.[2] Violation of the AMPs is not itself a violation of law. Thus, if defendants' claim that the court imposed penalties for violations of the AMPs was accurate, we would have to reverse.

■ We do not, however, find that defendants' claim is true. The court first concluded, based on its analysis of the language of 10 V.S.A. § 1259(a), that defendants had discharged waste substances into the state's waters. Only then did it examine defendants' compliance with the AMPs on the basis that compliance with the AMPs "will allow the logger to avoid citation for discharges." Therefore, the court imposed penalties only because it found "that a violation of 10 V.S.A. Section 1251(a)[3] occurred *and* . . . Defendants failed to comply with the A.M.P.'s . . . ." The court did not penalize defendants for violation of the AMPs alone.

Defendants' fourth claim is that the court awarded punitive damages without a finding of malice. The court did not explain in detail why it awarded punitive damages, in the amount of $5,000, against defendants. It stated that it did so "for having

---

[2] The Agency took the position at argument that the AMPs were promulgated pursuant to 10 V.S.A. § 1259(f). That subsection provides that subsections (c), (d) and (e) of § 1259 do not apply to "accepted agricultural or silvicultural practices, as such are defined by the commissioners of agriculture, food and markets and forests, parks and recreation." If the Agency's position is accurate, it is difficult to see how compliance with the AMPs has any effect in this case. The Agency has not alleged a violation of subsections (c), (d) or (e) of § 1259. Its case is based on § 1259(a). Compliance with the AMPs does not immunize one from liability for § 1259(a) violations.

The case was tried on the theory that compliance with the AMPs would shield defendants from liability under 10 V.S.A. § 1259(a). If this theory is inaccurate, there is no prejudice to defendants since the Agency is not claiming that defendants violated § 1259(a) despite compliance with the AMPs.

[3] This is clearly a typographical error, and the cite was intended to be to § 1259(a). There is no 10 V.S.A. § 1251(a).

624

knowingly and willfully discharged substances into waters of the state."

■■ The statutory authority for imposition of punitive damages is contained in 10 V.S.A. § 1274(a)(5). The statute does not specify the grounds necessary for imposition of punitive damages. Punitive damages are normally imposed in this state as punishment and as a deterrent. *Coty v. Ramsey Assocs.*, 149 Vt. 451, 467, 546 A.2d 196, 207 (1988). In *Bruntaeger v. Zeller*, 147 Vt. 247, 253, 515 A.2d 123, 127 (1986), we held that an award of exemplary damages can be made under the Vermont Consumer Fraud Law only on a showing of "malice, ill will, or wanton conduct." That holding was based on common law principles because the Consumer Fraud Law, like the statute before us in this case, did not specify the proper grounds for awarding punitive damages. We see no reason to depart from the reasoning of *Bruntaeger* and hold that punitive damages under § 1274(a)(5) can be awarded only where malice, ill will or wanton conduct is shown.

In this case, the trial court found that defendants' conduct was knowing and willful. Some of our cases suggest that willfulness alone can support an award of punitive damages. See, e.g., *Bruntaeger*, 147 Vt. at 253, 515 A.2d at 127 (punitive damages can be awarded if defendant's conduct is malicious, willful, or demonstrative of a reckless and wanton disregard of plaintiff's rights). More recently, we held that failure to honor a contractual obligation to a consumer, although characterized by the trial court as a willful violation of the Consumer Fraud Act, would not support an award of punitive damages where the default was motivated by "an unwillingness to make the necessary expenditures." *Meadowbrook Condominium Ass'n v. South Burlington Realty Corp.*, 152 Vt. 16, 28, 565 A.2d 238, 245 (1989).

■■ In civil cases, we have generally used the term "willful" as a synonym for "intentional," "in contradistinction to 'accidental' or 'unavoidable.'" *Wendell v. Union Mutual Fire Insurance Co.*, 123 Vt. 294, 297, 187 A.2d 331, 332 (1963); see also *In re Cote*, 93 Vt. 10, 14, 106 A. 519, 521 (1918) (in civil cases, willful means intentional; in criminal cases, the term has a "different and darker shade of meaning"). Because punitive

damages are awarded "on account of the bad spirit and wrong intention" of the defendant, *Glidden v. Skinner*, 142 Vt. 644, 648, 458 A.2d 1142, 1144 (1983), with the goal of punishing morally culpable conduct, *Coty*, 149 Vt. at 467, 546 A.2d at 207, we believe that there must be some showing of bad motive to make knowing and intentional conduct malicious. Thus, we conclude that the court must find more than willful and knowing conduct to support an award of punitive damages.

As an alternative ground for upholding the punitive damage award, the Agency argues that the court could have imposed an additional civil penalty under 3 V.S.A. § 2822(c) (repealed 1989), because defendants violated the preliminary injunction issued by the court. The short answer to this argument is that the trial court declined to impose additional damages for violation of the injunction in part because the Agency failed to provide "specific evidence of Defendant's ability to comply." We will not uphold damages imposed for specified violations on one theory because the court could have imposed similar damages for a different violation on another theory.

While the evidence in this case may support a finding that defendants were so indifferent to their legal obligations and the environmental consequences of their acts that they acted with malice, the trial court failed to so find. We therefore reverse the punitive damages assessment and remand for additional findings on the issue of malice.

*The order of the Windsor Superior Court imposing civil penalties is affirmed. The order imposing punitive damages is reversed and remanded.*