**Carole KOLSTAD, Appellant/Cross-Appellee,**

v.

**AMERICAN DENTAL ASSOCIATION, Appellee/Cross-Appellant.**

**Nos. 96-7030, 96-7047.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 15, 1996.

Decided March 21, 1997.

Order on Rehearing In Banc May 28, 1997.

Joseph A. Yablonski, Washington, DC, argued the cause and filed the briefs for appellant/cross-appellee.

Bruce S. Harrison, Baltimore, MD, argued the cause for appellee/cross-appellant. With him on the briefs was Elizabeth Torphy-Donzella.

Opinion for the Court filed by Circuit Judge TATEL.

Opinion concurring in part and dissenting in part filed by Circuit Judge WILLIAMS.

TATEL, Circuit Judge:

A jury awarded Carole Kolstad back pay after finding that her employer had violated her rights under Title VII of the 1964 Civil Rights Act by denying her a promotion because she is a woman. The district court entered judgment against the employer in the amount of the jury award, but denied Kolstad further relief. Because the jury could reasonably find from the evidence that Kolstad's employer intentionally discriminated against her on the basis of sex, we hold that the district court properly denied the employer's motion for judgment as a matter of law, but that it erred in refusing to instruct the jury on punitive damages. We thus remand the case for trial on Kolstad's punitive damages claim and for reconsideration of her claims for further equitable relief and attorney's fees.

I

A Chicago-based professional association, the American Dental Association (ADA) maintains an office in Washington, D.C. to represent its members' interests before Congress and various federal agencies. In September 1992, Jack O'Donnell, the second-highest ranking employee in ADA's Washington office, announced his retirement at year's end. O'Donnell held the dual-titled position of Director of Legislation and Legislative Policy and Director of the Council on Government Affairs and Federal Dental Services. His responsibilities included developing and communicating ADA's positions on federal legislation and regulations affecting its membership, and managing tri-annual meetings of the Council on Governmental Affairs, a policy-making body composed of ADA members.

Upon learning of O'Donnell's retirement, appellant Carole Kolstad, then serving as ADA's Director of Federal Agency Relations, and Tom Spangler, then ADA's Legislative Counsel, each expressed interest in O'Donnell's job. A lawyer, Kolstad had handled federal regulatory issues at ADA for four years, consistently receiving "distinguished" performance evaluations from the Director of ADA's Washington office, a position held in 1992 by Leonard Wheat. Earlier in her career, Kolstad had spent six years in the General Counsel's office of the Department of Defense, where she drafted proposed legislation, prepared testimony for Congressional hearings, and represented the Department's interests on Capitol Hill. Also a lawyer, Spangler had worked at ADA for twenty months, focusing on legislative issues facing the organization. He too had received "distinguished" performance evaluations from Wheat. Prior to joining ADA, Spangler had spent five years lobbying Congress on behalf of the National Treasury Employees Union. Kolstad and Spangler each had experience working with O'Donnell, with Spangler principally supporting his lobbying efforts and Kolstad, his management of the Council.

Although Wheat had the authority to name O'Donnell's replacement, he asked Dr. William Allen, ADA's Executive Director in Chicago, to make the appointment. After consulting with Wheat, Allen drafted a revised "Position Description Questionnaire" for O'Donnell's job that incorporated verbatim many of the job responsibilities recorded on the Position Description Questionnaire that had been used to hire Spangler for the Leg-

islative Counsel position in 1991. In October 1992, three months before O'Donnell's retirement, Wheat signed a performance evaluation of Spangler that listed as one of Spangler's 1993 goals to "provide management and administrative support ... for the Council on Government Affairs," work that O'Donnell was then performing.

Spangler formally applied for O'Donnell's position once it was posted in mid-November 1992. After writing Allen that Wheat had refused for several weeks to meet with her to discuss her interest in the position, Kolstad also applied. Following interviews with both Spangler and Kolstad, Wheat recommended Spangler for the job. Allen then offered Spangler the promotion, which he accepted. Informing Kolstad of the decision, Allen explained that she lacked experience with health care reform and was too valuable to ADA in her current position to take on O'Donnell's job.

After exhausting her administrative remedies before the Equal Employment Opportunity Commission, Kolstad filed suit, charging ADA with unlawful employment discrimination and seeking equitable relief, 42 U.S.C. § 2000e–5(g)(1), and damages, 42 U.S.C. § 1981a (1994). In her complaint, Kolstad demanded a jury trial on all claims. Prior to opening arguments at trial, Kolstad informed the district court that the parties had agreed to try her claims for equitable relief to the court, with the jury rendering an advisory verdict on back pay pursuant to Federal Rule of Civil Procedure 39(c). The court agreed to try to the bench Kolstad's claim for the equitable remedy of instatement, but declined to rule on whether the jury would render an advisory verdict on the back pay claim. Kolstad proceeded to try her case to the jury, introducing evidence to support an award of back pay. At the close of evidence, the district court denied ADA's motion for judgment as a matter of law, but dismissed Kolstad's claims for compensatory and punitive damages, finding insufficient evidence to support them. With respect to back pay, the court stated, "I am going to put it to the jury and we can leave until after the fact whether it's advisory or binding."

Answering two special interrogatories, one on liability and the other on "damages," the jury found that ADA had unlawfully discriminated against Kolstad on the basis of sex, awarding her $52,718, precisely the amount she sought as back pay. Kolstad then moved for instatement into the position occupied by Spangler and for attorney's fees. ADA renewed its motion for judgment as a matter of law. In a memorandum opinion, the district court denied both motions. *Kolstad v. American Dental Ass'n,* 912 F.Supp. 13 (D.D.C. 1996). After concluding that the jury could properly find unlawful discrimination from the evidence, and that the jury's award of back pay was "conclusive" under Rule 39(c), the court held that Kolstad was not entitled to further equitable relief or attorney's fees because she had failed to prove "to the Court's satisfaction" that she was a victim of sex discrimination. *Id.* at 14 n. 1, 15–16. The court entered judgment against ADA in the amount of the jury award.

On appeal, Kolstad challenges the district court's refusal to allow the jury to consider an award of punitive damages, as well as the court's denial of her claims for instatement into the Director's job and attorney's fees. ADA cross-appeals the court's denial of its motion for judgment as a matter of law and the court's ruling that the jury's verdict was binding.

## II

We begin with ADA's challenge to the district court's denial of its motion for judgment as a matter of law. Reviewing the district court's ruling *de novo,* we ask whether the evidence was sufficient for a reasonable jury to have reached the challenged verdict. *Mackey v. United States,* 8 F.3d 826, 829 (D.C.Cir.1993).

Title VII of the 1964 Civil Rights Act provides that:

> It shall be an unlawful employment practice for an employer—
>
> (*l*) to fail or refuse to hire ... or otherwise to discriminate against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's ... sex....

42 U.S.C. § 2000e–2(a). In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93

S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set forth the basic allocation of burdens and order of proof in Title VII cases alleging discriminatory treatment, as the complaint does in this case. The plaintiff bears the initial burden of proving a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. at 1824. Where sex discrimination in promotion is alleged, a plaintiff proves her prima facie case by showing that she is female, that she was refused a position for which she applied and was qualified, and that the employer filled the position with a male. *See Valentino v. United States Postal Serv.*, 674 F.2d 56, 63 (D.C.Cir.1982); *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C.Cir.1981). If established, the prima facie case raises an inference of discrimination that the employer may rebut with evidence of legitimate, nondiscriminatory reasons for the plaintiff's rejection. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. The plaintiff then bears the ultimate burden of persuading the jury of intentional discrimination, which she may satisfy by proving that the defendant's proffered reasons were pretexts for unlawful discrimination. *Barbour v. Merrill,* 48 F.3d 1270, 1277 (D.C.Cir.1995), *cert. granted,* — U.S. ——, 116 S.Ct. 805, 133 L.Ed.2d 752, *cert. dismissed,* — U.S. ——, 116 S.Ct. 1037, 134 L.Ed.2d 113 (1996); *see McDonnell Douglas,* 411 U.S. at 802–805, 93 S.Ct. at 1824–26.

As in the district court, ADA concedes that Kolstad "met the paper qualifications for the vacancy," Appellee/Cross–Appellant's Br. at 37, and that the jury could have reasonably found that, despite her qualifications, "Kolstad never was in the running" for the Director's job because Executive Director Allen had decided, before the vacancy was posted,that Spangler was the best candidate to replace O'Donnell.Appellee/Cross–Appellant's Reply Br. at 10. ADA argues, however, that even assuming Spangler's preselection for the position, no reasonable jury could have concluded that Kolstad was a victim of sex discrimination because the evidence overwhelmingly demonstrates legitimate nondiscriminatory reasons for Kolstad's rejection. We disagree.

An employer's preselection of a job candidate, in violation of its own procedures requiring fair consideration of qualified applicants, is "undeniably relevant to the question of discriminatory intent," *Krodel v. Young,* 748 F.2d 701, 709 (D.C.Cir.1984), and "operates to discredit the employer's proffered explanation for its employment decision," *Goostree v. State of Tenn.,* 796 F.2d 854, 861 (6th Cir.1986); *see also Krodel,* 748 F.2d at 709 (improper selection procedures relevant to determination that employer's nondiscriminatory explanation unworthy of belief). Here, evidence that Allen "cut-and-paste" Spangler's job responsibilities into the Position Description Questionnaire for O'Donnell's position, that Office Director Wheat agreed that Spangler's goals for 1993 included performing portions of O'Donnell's job, and that Spangler began meeting extensively with O'Donnell as soon as his retirement was announced permitted the jury to conclude that ADA had selected Spangler to succeed O'Donnell before the posting of the position in November 1992. From evidence that Allen did not review Kolstad's performance evaluations or resume, failed to interview Kolstad for the position, and gave Kolstad a different explanation for her rejection than the one subsequently offered by ADA, the jury could also have reasonably found that ADA's claimed nondiscriminatory reasons for choosing Spangler over Kolstad—that Kolstad lacked recent legislative experience and strong writing skills—were after-the-fact rationalizations unworthy of belief.

We have held that a jury's "rejection of the employer's nondiscriminatory reasons, while not sufficient to *compel* a finding of discrimination, nonetheless suffices to *permit* such a finding." *Barbour,* 48 F.3d at 1277; *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749–50, 125 L.Ed.2d 407 (1993). As the Supreme Court has observed, " 'no additional proof of discrimination is required.' " *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749 (quoting *Hicks v. St. Mary's Honor Ctr.,* 970 F.2d 487, 493 (8th Cir.1992)). Thus, "a plaintiff need only establish a prima facie case and introduce evidence sufficient to discredit the defendant's proffered nondiscriminatory reasons; at that point, the fact finder, if so persuaded, may infer discrimination."

*Barbour,* 48 F.3d at 1277. Because Kolstad introduced sufficient evidence for the jury to conclude both that she had proven a prima facie case of discrimination and that ADA's proffered reasons were pretextual, the jury could have reasonably concluded that Kolstad proved intentional sex discrimination.

As in *Barbour,* while we need not speculate about the jury's reasoning, it could have inferred that Kolstad's sex—and not her qualifications—motivated ADA's actions. That inference could reasonably flow from Kolstad's prima facie case and the evidence of Spangler's preselection, as well as from Kolstad's testimony, contested but not incredible, that Wheat ignored her efforts to discuss the promotion, denied her other career-enhancing opportunities, told sexually offensive jokes at staff meetings, and referred to several professional women as "bitches" or "battleaxes." Although Wheat did not formally appoint O'Donnell's successor, he had the authority to do so, recommending to Allen that Spangler and not Kolstad get the job. Consistent with our cases and the evidence at trial, the district court properly denied ADA's motion for judgment as a matter of law.

III

Having decided that the jury could reasonably find that ADA intentionally discriminated against Kolstad, we next address Kolstad's challenge to the district court's dismissal of her claim for punitive damages.

Finding that "additional remedies under Federal law are needed to deter unlawful harassment and intentional discrimination in the workplace," 42 U.S.C. § 1981 (note) (1994) (Congressional Findings), Congress enacted the Civil Rights Act of 1991, significantly expanding the monetary relief potentially available to victims of unlawful discrimination. *See* 42 U.S.C. § 1981a; *Landgraf v. USI Film Products,* 511 U.S. 244, 252–55, 114 S.Ct. 1483, 1490–92, 128 L.Ed.2d 229 (1994). The Act provides that a plaintiff who proves intentional discrimination in violation of Title VII may recover compensatory and punitive damages in addition to equitable relief available under prior law. 42 U.S.C. § 1981a(a). Punitive damages may be awarded "if the [plaintiff] demonstrates that the [defendant] engaged in a discriminatory practice ... with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Act caps punitive damages, along with compensatory awards, at between $50,000 and $300,000, depending on the employer's size. 42 U.S.C. § 1981a(b)(3).

Relying on an excerpt from the Act's legislative history, ADA argues that Congress intended Title VII plaintiffs to recover punitive damages only in "extraordinarily egregious cases," suggesting that the quantum of proof necessary to sustain such an award is greater than courts have traditionally required. *See* 137 Cong. Rec. S 15473 (Oct. 30, 1991) (Interp. Mem. of Sen. Dole *et al.*). In response, Kolstad points to legislative history expressly contradicting this assertion: "Punitive damages are available under [§ 1981a] to the same extent and under the same standards that they are available to plaintiffs under 42 U.S.C. § 1981." *See* 137 Cong. Rec. H 9527 (Nov. 7, 1991) (Interp. Mem. of Rep. Edwards). Decisive to us, however, is section 1981a's plain language, which tracks the standard that courts had previously established for the proof required to sustain awards of punitive damages under other federal civil rights statutes. *See Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983) (plaintiff must prove "evil motive or intent, or ... reckless or callous indifference to the federally protected rights of others" for punitive award under § 1983); *Williamson v. Handy Button Mach. Co.,* 817 F.2d 1290, 1296 (7th Cir.1987) (applying same standard under § 1981). That standard, in turn, is rooted in the common law. *See, e.g.,* Restatement (Second) of Torts § 908(2) (1979) ("Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others."); *see also Wade,* 461 U.S. at 38–49, 103 S.Ct. at 1631–37. We think that if Congress had meant the courts to depart from well-established legal standards, it would have made that intention clear in the language of the Act. Because it did not do so, instead choosing language already laden with

meaning, and because we find no authoritative legislative history to suggest otherwise, we hold that the standard of proof required to sustain awards of punitive damages under 42 U.S.C. § 1981a is the same as that previously established for punitive awards under 42 U.S.C. §§ 1981 and 1983.

As both the Supreme Court and this court have explained, "evidence that suffices to establish an *intentional* violation of protected civil rights also may suffice to permit the jury to award punitive damages, provided that the jury, in its 'discretionary moral judgment,' finds that the conduct merits a punitive award." *Barbour,* 48 F.3d at 1277 (emphasis added) (citations omitted) (quoting *Wade,* 461 U.S. at 52, 103 S.Ct. at 1638). In such cases, "[n]o additional evidence is required," *id.,* because "the state of mind necessary to trigger liability for the wrong is at least as culpable as that required to make punitive damages applicable." *Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 205 (1st Cir.1987). Having concluded that the jury could reasonably find from the evidence that ADA intentionally discriminated against Kolstad, the district court should have instructed the jury that upon the requisite finding—malice or reckless indifference to Kolstad's rights—it could consider a punitive award. The evidentiary threshold having been reached, discretion to award punitive damages, within the limits set by statute, lay with a properly instructed jury, not the court.

Citing legislative history from the unadopted House version of the 1991 Act and case law from other jurisdictions, our dissenting colleague argues that "something substantially more blameworthy" than "garden-variety" intentional race or sex discrimination should be required before a jury may consider a punitive award under § 1981a. Dissent at 1441, 1446. We note that the House Report on which the dissent relies states clearly that the new law "sets the same standard courts have applied under § 1981," H.R.Rep. No. 40(I), 102d Cong., 1st Sess. at 74, and cites the First Circuit's decision in *Rowlett v. Anheuser–Busch,* as well as *Smith v. Wade,* cases which support, in our view, this court's § 1981 jurisprudence. Consistent with our holding in *Barbour* and the Supreme Court's reasoning that "society has an interest in deterring and punishing *all* intentional or reckless invasions of the rights of others," *Wade,* 461 U.S. at 54–55, 103 S.Ct. at 1639, we can conceive of no principled basis for second-guessing the jury's "discretionary moral judgement," *id.,* about which acts of intentional discrimination are sufficiently "outrageous" or "egregious" to merit punitive awards. Nor, as the dissent admits, do the cases from our sister circuits supply one, much less the smattering of state court cases which the dissent implies have worked some change in the common law since *Wade.* If, as the dissent suggests, something is missing from Kolstad's case *as a matter of law,* what is it? Or, as the First Circuit put the question in a different context, "can it really be disputed that intentionally discriminating against a black man on the basis of his skin color is worthy of some outrage?" *Rowlett,* 832 F.2d at 206. Absent persuasive answers to these questions or further guidance from Congress, we leave the decision to award punitive damages for intentional civil rights violations to the jury.

By our decision today, we do not suggest that evidence sufficient to establish liability under Title VII for intentional discrimination will always sustain an award of punitive damages under section 1981a. Not every employment practice violating Title VII is "obviously the kind of conduct that society normally will not tolerate." *Hernandez–Tirado v. Artau,* 874 F.2d 866, 869 (1st Cir.1989) (setting aside punitive damages in § 1983 case of politically motivated demotion of public official). Rather, it may be "conduct that sometimes is lawful and sometimes is not, depending on a complex set of legal rules ... that a particular [employer] might, or might not, actually understand." *Id.* at 869–70. Thus, where an employer does not deny discrimination but defends on the ground that the discrimination is not unlawful, evidence sufficient to support a finding of liability might not also support a finding of malice or reckless disregard of federally protected rights. For example, evidence that an employer erroneously used religion, sex, or national origin as a "bona fide occupational qualification" for employment, *see* 42 U.S.C.

§ 2000e-2(e), may be insufficient to support an award of punitive damages. Evidence that an employer overreached in its efforts lawfully to remedy the effects of past discrimination likewise might be insufficient to establish that the employer acted maliciously or recklessly. In such cases, although the challenged employment practice amounts to "intentional" discrimination, it may only be "negligent [as] to the existence of a federally protected right," *Hernandez-Tirado,* 874 F.2d at 870. We also think that where intentional discrimination occurs outside the scope of the agency relationship between employer and employee—in a hostile work environment case, for example—evidence sufficient to support employer liability may not establish that the employer maliciously or recklessly permitted the offending conduct. *See, e.g., Farpella-Crosby v. Horizon Health Care,* 97 F.3d 803, 809-10 (5th Cir.1996); *see generally Gary v. Long,* 59 F.3d 1391 (D.C.Cir.1995) (discussing application of agency law to hostile work environment claims). In each of these kinds of cases, the district court may need to assess separately whether evidence sufficient to support a finding of intentional discrimination also suffices to instruct the jury on punitive damages.

This case does not present these or analogous circumstances. ADA neither attempted to justify the use of sex in its promotion decision nor disavowed the actions of its agents. Rather, it flatly denied Kolstad's allegation of invidious sex discrimination, discrimination lying at the heart of Title VII that society no longer tolerates. Having produced evidence sufficient to prove her charge, Kolstad was entitled to have the jury consider whether ADA's conduct warranted a punitive award. We thus remand the case to the district court for trial on Kolstad's punitive damages claim.

This brings us to Kolstad's argument that, in a trial of her claim for punitive damages, she should be permitted to introduce in evidence a consent decree settling a prior discrimination suit brought against ADA in which the association, although admitting no liability, conceded that "preselection of a favored candidate" is contrary to its personnel policies. The district court ruled the consent decree inadmissible at trial, finding its probative value as evidence of ADA's preselection of Spangler substantially outweighed by its possibly prejudicial effect on the jury. *See* Fed.R.Evid. 403. Although finding no abuse of discretion in the district court's ruling, *see Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 554 (D.C.Cir.1993) (Rule 403 determination reversed only for abuse of discretion), we note the court's suggestion that it would reconsider the decree's admissibility to impeach the testimony of ADA's witnesses. Because Kolstad did not offer the document for impeachment purposes, we express no opinion on whether, or in what circumstances, the consent decree might now be admissible as evidence to support Kolstad's claim for punitive damages. *See Johnson v. WMATA,* 883 F.2d 125, 130 (D.C.Cir.1989) (in Rule 403 balancing, court must consider probative value in light of other evidence at trial).

## IV

We turn finally to the parties' respective challenges to the district court's treatment of the jury's verdict. ADA argues that the district court erred by ruling that the jury's verdict was binding on the court. Because the parties had agreed that the jury would sit only in an advisory capacity with respect to back pay, and because back pay was the only claim for relief to reach the jury, ADA contends that the jury's verdict was advisory in its entirety, and that we should remand the case to the district court for findings of fact and conclusions of law under Federal Rule of Civil Procedure 52. Kolstad disagrees, arguing that because she was entitled to a jury trial on her claims for compensatory and punitive damages, *see* 42 U.S.C. § 1981a(c), the district court was bound to accept the jury's verdict notwithstanding the dismissal of those claims. She thus contends that the district court erred in rejecting her claims for further equitable relief and attorney's fees based on the court's independent view of the evidence. Although we agree that the district court erred in its treatment of the jury's verdict, we conclude that the proper disposition of this case lies in between the parties' competing positions.

To begin with, we agree with Kolstad that the jury's determination of liability must remain undisturbed. But for the court's error in dismissing Kolstad's punitive damages claim, the jury's verdict would have been conclusive, as a claim for punitive damages capable of withstanding summary judgment entitled Kolstad to a jury trial. Furthermore, when the district court expressed its view that the evidence was insufficient to support an award of either compensatory or punitive damages, ADA neither moved to dismiss the jury nor expressly argued, as it does now, that the jury's determination of liability could therefore only be advisory. Rather, ADA's counsel suggested that "the issue for the jury, if the court were to have the jury provide an advisory verdict *on damages,* would be whether Ms. Kolstad is entitled to back pay...." As a result, the district court framed this question, "[A]re you agreed that if I allow the jury to deliberate *on damages,* it is an advisory verdict *to the extent that it represents back pay?*" Although the record is not entirely clear on this point, it seems to us that both the parties and the court were operating on the assumption that the jury would conclusively decide the question of liability, regardless of whether the jury's determination of the back pay award was only advisory.

As to the question of back pay, we agree with ADA that the district court was not bound by the jury's verdict. Before voir dire, Kolstad represented to the district court that the parties had agreed "to the jury resolving questions in an advisory capacity with respect to the equitable relief," including back pay, under Rule 39(c). Although that rule gives the district court discretion to try equitable claims with an advisory jury, Rule 52(a) requires in such cases that the court enter its own findings of fact and conclusions of law. Fed.R.Civ.P. 39(c), 52(a). Because the record does not reflect that ADA consented to a binding jury determination of Kolstad's back pay award, the jury's verdict was advisory on that score. On remand, the district court must therefore make its own findings as to the amount of back pay, if any, Kolstad should receive.

Finally, the district court must also reconsider Kolstad's claims for further equitable relief and attorney's fees. Consistent with the Seventh Amendment's command that "no fact tried by a jury[ ] shall be otherwise reexamined in any Court of the United States," U.S. Const. amend. VII, "when a case contains claims triable to a jury and claims triable to the court that involve common issues of fact, the jury's resolution of those issues governs the entire case." *Bouchet v. National Urban League, Inc.,* 730 F.2d 799, 803 (D.C.Cir.1984); *see generally Dairy Queen v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). As our sister circuits have uniformly held in cases involving allegations of intentional discrimination, the district court must therefore follow the jury's factual findings with respect to a plaintiff's legal claims when later ruling on claims for equitable relief. *See, e.g., Sorlucco v. New York City Police Dept.,* 971 F.2d 864, 873–74 (2d Cir.1992); *Miller v. Fairchild Indus., Inc.,* 885 F.2d 498, 507 (9th Cir.1989) (citing additional cases). Contrary to this principle, the district court here denied Kolstad's claim for instatement, as well as her petition for attorney's fees, on the ground that she had not proven her claim of intentional sex discrimination "to the Court's satisfaction." Because we agree with the district court that the jury's finding of intentional discrimination must be upheld, Kolstad is entitled to have her claims for equitable relief and attorney's fees properly considered by the court in light of the jury's verdict.

Affirming the district court's denial of ADA's motion for judgment as a matter of law, we remand the case to the district court for trial on punitive damages and for reconsideration of Kolstad's claims for equitable relief and attorney's fees.

*So ordered.*

STEPHEN F. WILLIAMS, Circuit Judge, concurring in part and dissenting in part.

I concur in much of the decision, but not in the conclusion that in a Title VII suit the minimum standard of evidence for punitive damages is, with narrow exceptions, no higher than the standard for liability. See Maj. Op. at 1437–39.

The 1991 Civil Rights Act authorizes punitive damage awards in Title VII cases where the defendant engaged in the discriminatory act "with malice or with reckless indifference to the [plaintiff's] federally protected rights." 42 U.S.C. § 1981a(b)(1) (1994). The majority concludes that in the ordinary claim of sex discrimination, which must be intentional to be actionable (except for "disparate impact" liability, for which the statute expressly precludes punitive damages), the jury is automatically empowered to find malice or reckless indifference. Maj. Op. at 1437–38. The ruling may seem to manifest impeccable logic, as an intent to discriminate seems to encompass "reckless indifference" to the rights of the discrimination victim. But the upshot of the majority's view is that punitive damages are available in every case of garden-variety Title VII discrimination, excepting only a few rather unusual ones such as claims dependent on an employer's miscalculation of the bona fide occupational qualification exception. See Maj. Op. at 1438–39. But if this were Congress's intent, why would there be a separate provision purporting to describe a special standard for punitive damages?

Every circuit to address the question thus far has read § 1981a to demand proof of a more culpable state of mind for punitive damages than the ordinary intent necessary for a violation of Title VII. *Emmel v. Coca-Cola Bottling*, 95 F.3d 627, 636 (7th Cir.1996) (characterizing standard for punitive damages as a "higher hurdle" than that for proving the underlying discrimination); *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1216 (6th Cir.1996) (despite sufficiency of evidence for liability and "duplicitous" actions of defendant's employees, evidence insufficient for punitive damages); *Karcher v. Emerson Electric Co.*, 94 F.3d 502, 509 (8th Cir.1996) (although jury could properly infer intentional sex discrimination from inconsistent nature of hiring process and failure to select and train women, it could not find malice or deliberate indifference); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 830 n. 9 (4th Cir.1994) (stating in dictum that "[w]hile 'intentional discrimination' suffices to recover compensatory damages, Congress requires a heightened showing of discriminatory action ... to recover punitive damages"); *McKinnon v. Kwong Wah Restaurant*, 83 F.3d 498, 507–09 (1st Cir.1996) (endorsing concept of a higher standard for punitive damages; rejecting district court's denial of punitive damages solely on basis of cultural factors, but acknowledging that cultural factors would "likely have an impact on [a defendant's] consciousness of wrongdoing"). None of these opinions, to be sure, offers much by way of explanation, although *McKinnon* points to a comparatively useful piece of legislative history, the House Report on language almost identical to that of the final bill:

> Plaintiffs must first prove intentional discrimination, then must prove actual injury or loss arising therefrom to recover compensatory damages, *and must meet an even higher standard* (establishing that the employer acted with malice or reckless or callous indifference to their rights) *to recover punitive damages.*

*Id.* at 507, quoting H.R.Rep. No. 40(I), 102d Cong., 1st Sess. at 72 (1991) (emphasis added) ("House Report").[1] To justify creating a split with five sister circuits (particularly in light of this item of legislative history), we ought to have a powerful reason. I don't see it.

* * *

I agree with the majority's general proposition that it is sensible to look to standards rooted in the common law to understand what Congress meant when using the phrase "malice or reckless indifference." But in what seems to me the relevant context, namely decisions relating to intentional torts and of roughly the vintage of the 1991 Act, the common law appears to require a state of mind more extreme than what is required for

1. The majority dismisses the House Report as involving "the unadopted House version of the 1991 Act." Maj. Op. at 1438. But the only conceivably material difference in wording is that the House bill allowed punitive damages on a *broader* basis than the ultimate legislation, as it permitted them where defendant engaged in discriminatory practices "with malice, or with reckless *or* callous indifference to [plaintiff's] federally protected rights," House Report at 12 (emphasis added), the key difference being addition of the word "callous" in the alternative.

the intentional tort on which the punitive claim is piggybacked.

In *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the Court addressed the right of plaintiffs to punitive damages in cases arising under 42 U.S.C. § 1983. The claim was that the defendant prison guard had failed to protect the plaintiff inmate from harassment, beatings and sexual assault by fellow inmates. The plaintiff had proved gross negligence on the part of the guard, and thus a violation of plaintiff's Eighth Amendment right. *Id.* at 33, 103 S.Ct. at 1628. As § 1983 made no reference to punitive damages, the Court looked to the common law for the appropriate standard. It rejected the proposition that "actual malicious intent—'ill will, spite, or intent to injure'," *id.* at 37, 103 S.Ct. at 1630, was required for punitive damages, and held instead that they were allowable when the defendant's conduct was "motivated by evil motive or intent, or when it involve[d] reckless or callous indifference to the federally protected rights of others." *Id.* at 56, 103 S.Ct. at 1640. The Court reasoned that "the rule in a large majority of [states] was that punitive damages ... could be awarded without a showing of actual ill will, spite, or intent to injure." *Id.* at 41, 103 S.Ct. at 1632. A dissent by Justice Rehnquist, joined by Chief Justice Burger and Justice Powell, read the historic record differently, arguing that "at least some degree of bad faith or improper motive" was required. *Id.* at 56, 103 S.Ct. at 1640. Justice O'Connor also dissented. Finding that the historical record provided no real guidance on the intent of Congress at the time of enactment in 1871, she reasoned that the majority's standard was inconsistent with the purposes of § 1983.

Obviously it is not our place to replay this argument. I make only a narrower point. In the area of intentional torts, the common law analog of intentional discrimination, courts generally require an especially egregious intent, even when they are applying punitive damage standards *phrased* the same as the one set forth in *Smith v. Wade* and echoed in § 1981a(b)(1). In doing so, they apply the general principle that "[s]omething more than the mere commission of a tort is always required for punitive damages." W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 2, at 9 (5th ed.1984); see also *id.* at 11 ("it is not so much the particular tort committed as the defendant's motives and conduct in committing it"). To be sure, the *Smith v. Wade* majority's reading of the "rules of ordinary tort law" in substance rejected Prosser & Keeton's. 461 U.S. at 53, 103 S.Ct. at 1638–39. But in the realm of intentional torts such a rejection has little support.

The Restatement (Second) of Torts, Section 908, for instance, asserts a generality similar to the wording of *Smith v. Wade* and of § 1981a, saying that punitive damages are allowable "for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." One might expect that under this formula plaintiffs asserting any intentional tort could automatically get to the jury on punitive damages. But the comments to the Restatement draw such a claim in question. Comment b says that damages are only appropriate where there is "some element of outrage similar to that usually found in crime." See also comment d (although award of punitive damages left to jury discretion, "[i]t is error ... to award punitive damages if there has been no bad motive or wanton indifference").

Some state courts have explicitly interpreted the Restatement to require some evidence of bad motive in the intentional tort context. The Missouri Supreme Court in *Burnett v. Griffith,* 769 S.W.2d 780 (1989) (en banc), said that it "is not so much the commission of the intentional tort as the conduct or motives—the defendant's state of mind—which prompted its commission that form the basis for a punitive damage award." *Id.* at 787. "Plaintiff must prove that defendant's evil hand was guided by an evil mind." *Id.* The court *rejected* a jury instruction stating that malice "does not mean hatred, spite or ill will, as commonly understood, but means the doing of a wrongful act intentionally without just cause or excuse," *id.* at 788, explaining that the language failed to explain to jurors that "a bad motive or reckless disregard for the rights of others is required." *Id.* at 789; see also *Ryburn v. General Heating & Cool-*

*ing, Co.,* 887 S.W.2d 604, 609 (Mo.App.1994) (interpreting *Burnett* as focusing "on the matter of moral culpability so that the jury would not impose punitive sanction on a defendant for the mere commission of an intentional tort").

Similarly, the D.C. Court of Appeals has construed language at least as loose as that of § 1981a ("fraud, ill will, recklessness, wantonness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury") to require, for the tort of intentional interference with contract, something more than the intent necessary for the tort itself. *Dyer v. William S. Bergman & Assocs.,* 657 A.2d 1132, 1139 n. 10 (D.C.1995). Given the "overlap" between the state of mind needed for punitive damages and that needed for tortious interference with contract, the court said:

> [T]rial judges must be alert to the need to frame their instructions to the jury in a way that makes it clear that proof of intentional interference [with contract] does not automatically entitle the plaintiff to an award of punitive damages.
>
> Arguably, where the tort alleged is an intentional one, inherently containing elements of willfulness, an award of punitive damages must rest upon that tort being committed in an outrageous way; in other words, the "outrageousness" cannot be supplied by the conduct required to commit the tort itself.

*Id.* And Alaska, which at least nominally allows punitive damages for "reckless indifference" to others' interests, *Alyeska Pipeline Service Co. v. O'Kelley,* 645 P.2d 767 (Alaska 1982), in fact denies them where an intentional tort is not accompanied by evidence supporting an inference of "actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice". *Id.* at 774.

Similarly, Vermont courts have used "reckless" language, but seem to require bad motive on top of the intentional tort. Vermont limits "exemplary" or punitive damages to cases of "malice, ill will, or wanton conduct," but includes within those terms action that is "*reckless* with regard to the plaintiff's rights." *Bruntaeger v. Zeller,* 147 Vt. 247, 515 A.2d 123, 127 (1986) (emphasis added). Yet, when applying the same formulation in *State Agency of Natural Resources v. Riendeau,* 157 Vt. 615, 603 A.2d 360 (1991), it held that under a statute imposing ordinary liability for "willful" violations, punitive damages could be awarded only for "bad spirit and wrong intention," and that therefore plaintiff must show "some ... bad motive [that makes the] knowing and intentional conduct malicious." *Id.* 603 A.2d at 365; cf. *id.* (distinguishing between the meaning of "willful" in civil cases, where it is "a synonym for 'intentional'" and in criminal cases, where it has a "different and darker shade of meaning").

Cases of an insurer's *bad faith* denial of insured's claims pose a related issue. The tort's label suggests that it requires a more culpable state of mind than mere "intention," but courts in some jurisdictions allow recovery where the insurer has acted in "reckless disregard" of its lack of a reasonable basis for denial. *McCullough v. Golden Rule Insurance Co.,* 789 P.2d 855, 860 (Wyo.1990); *Anderson v. Continental Insurance Co.,* 85 Wis.2d 675, 271 N.W.2d 368, 376 (1978). In any event, courts appear to have reacted with the same impulse to reserve punitive damages for egregious cases. When the Wyoming Supreme Court embraced the tort, it hastened to refute the suggestion that every such claim would entail a possibility of punitive damages, saying that plaintiff must also show "wanton or willful misconduct," *McCullough,* 789 P.2d at 861, even though Wyoming nominally allows punitive damages for "reckless indifference," *id.* at 860 n. 11. The court quoted decisions from other jurisdictions requiring not only intentional breach of the duty of good faith, but "oppression, fraud, or malice." *Id.* at 861.

Wisconsin courts similarly demand an extra notch of evil:

> [T]here is a distinction between the intent or malice necessary to maintain an action for intentional tort (such as bad faith) and the intent which must be shown to recover punitive damages.... [T]here must be a showing of an evil intent deserving of punishment or something in the nature of

special ill-will or wanton disregard of duty or gross or outrageous conduct.

*Anderson,* 271 N.W.2d at 379; see also *Mid-Continent Refrigerator Co. v. Straka,* 47 Wis.2d 739, 178 N.W.2d 28, 32–33 (1970) (noting distinction between "the intent or malice necessary to maintain an action for an intentional tort and that necessary to recover punitive damages" and stating that "something must be shown over and above the mere breach of duty for which compensatory damages can be given").

Some courts, to be sure, take the view that where the elements of an intentional tort entail characteristics justifying punitive damages in other contexts, they are freely available even though the effect is to make punitive damages possible wherever liability is found. See, e.g., *Ellerin v. Fairfax Savings, F.S.B.,* 337 Md. 216, 652 A.2d 1117, 1126 (1995) ("elements of the tort of [intentional] fraud or deceit in Maryland ... include the type of deliberate wrongdoing and evil motive that has traditionally justified the award of punitive damages"); *Owens v. Parker Drilling Co.,* 207 Mont. 446, 676 P.2d 162, 165 (1984) ("where a statute is designed to protect the substantial interests of a person from a high degree of risk, and the statute is violated either intentionally or recklessly, a jury question of punitive damages is raised"); *McMullin v. Murphy,* 89 Or.App. 230, 748 P.2d 171, 173 (1988) ("evidence sufficient to establish intentional fraud is also necessarily sufficient to support the requisite findings for the imposition of punitive damages, without additional or independent evidence pertaining to the culpability of the defendant's conduct or state of mind").

Perhaps lining up citations on both sides of this question is just another "unilluminating, exegesis of the common law" similar to that in *Smith v. Wade,* which Justice O'Connor there described as yielding only "inexact and contradictory language" unhelpful in interpreting a statute. 461 U.S. at 92–93, 103 S.Ct. at 1658–59 (O'Connor, J., dissenting). But that was the Court's approach in *Smith v. Wade,* and in this search for analysis by state common law courts I find the weight of authority against the idea that just because the governing formula allows punitives for "reckless" behavior it follows that all intentional torts are eligible for punitive damages. In addition, to the extent that there appears to be a split of authority on the question, the split is less close than it appears in view of other measures taken to constrain the award of punitives.

The concern that punitive damages ought not be awarded in every case is reflected in a variety of devices designed to reduce their incidence. See generally Restatement (Second) of Torts, § 908, comment f; see also *BMW of North America, Inc. v. Gore,* — U.S. —, —, 116 S.Ct. 1589, 1618, 134 L.Ed.2d 809 (1996) (Ginsburg, J., dissenting) (appendix summarizing recent state legislative activity designed to reduce the incidence of punitive damages). More than half the states require that evidence supporting punitive damages be "clear and convincing," most of them doing so by statute but several by common law adjudication. See Brian T. Beasley, "North Carolina's New Punitive Damages Statute: Who's Being Punished, Anyway?" 74 N.C. L.Rev. 2174, 2201 (1996) (appendix providing survey of punitive damage provisions in all 50 states). Although the standard of proof is not at issue in this case, the reasons for adoption of a clear and convincing standard suggest a widespread understanding that the award of punitive damages should not be an everyday event. See, e.g., *Masaki v. General Motors Corporation,* 71 Haw. 1, 780 P.2d 566, 574–75 (1989) (more exacting standard because punitive damages are stigmatizing punishment of a "quasi-criminal" type); *Linthicum v. Nationwide Life Insurance Co.,* 150 Ariz. 326, 723 P.2d 675, 681 (1986) (en banc) (applying higher standard because punitive damages are "only to be awarded in the most egregious of cases, where there is reprehensible conduct combined with an evil mind over and above that required for commission of a tort"); *Tuttle v. Raymond,* 494 A.2d 1353, 1363 (Me.1985) (adopting clear and convincing standard because of the risk posed by punitive damages if they can be "loosely assessed").

In light of this common law background, it seems improbable that in adopting § 1981a Congress intended to adopt a punitive damage standard creating near-universal availability, despite its use of "recklessness" in the statutory formulation.

* * *

As the majority opinion makes clear, the common law is not the only source for interpretation. We can also look to how courts have interpreted a kindred provision, 42 U.S.C. § 1981.[2] Here the circuits are split, with three demanding more than mere intent to discriminate and three not doing so; of the latter, the First and Seventh decline to extend the reasoning to § 1981a.

In *Beauford v. Sisters of Mercy–Province of Detroit,* 816 F.2d 1104 (6th Cir.1987), the court cited language from *Smith v. Wade* but then stated that punitive damages in civil rights actions have "generally been limited to cases involving egregious conduct or a showing of willfulness or malice on the part of the defendant." *Id.* at 1109. Although finding enough evidence of intentional discrimination, the court said there was no evidence of "the requisite malice or reckless or callous indifference of an egregious character," so punitive damages could not be awarded. *Id.* The court in *Stephens v. So. Atlantic Canners, Inc.,* 848 F.2d 484 (4th Cir.1988), followed *Beauford,* observing that an award of punitive damages "is an extraordinary remedy and is designed to punish and deter particularly egregious conduct." *Id.* at 489. Though the evidence was adequate for plaintiff to get to the jury on intentional discrimination, and though noting that any form of discrimination "constitutes reprehensible and abhorrent conduct," *id.*, the court found the evidence inadequate for punitive damages. And in *Walters v. City of Atlanta,* 803 F.2d 1135 (11th Cir.1986), a § 1983 action based upon racial discrimination, after finding the evidence adequate on liability, the court held that several of the defendants who had denied plaintiff employment had nonetheless not "acted with either the requisite ill will or callous disregard" to justify punitive damages.

In the opposite camp are this circuit, the First and the Seventh. In *Barbour v. Merrill,* 48 F.3d 1270 (D.C.Cir.1995), *cert. granted,* — U.S. —, 116 S.Ct. 805, 133 L.Ed.2d 752, *cert. dismissed,* — U.S. —, 116 S.Ct. 1037, 134 L.Ed.2d 113 (1996) (voluntary settlement by parties), we held that under § 1981 the jury's (sustainable) "finding of intentional racial discrimination permitted it to find" the requisite ill will or reckless or callous indifference for punitive damages. *Id.* at 1277. The First Circuit may have a similar rule. In *Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 205–07 (1st Cir.1987), it declined to adopt an aggravation requirement for punitive damages under § 1981, leaving to the trier of fact "discretion to determine whether punitive damages are necessary" where punitive damages are authorized for intentional violations. *Id.* at 205. But in *McKinnon v. Kwong Wah Restaurant* the Circuit quoted and followed the "higher standard" requirement set forth in the House Report, as noted above. See 83 F.3d at 507.

The Seventh Circuit is yet harder to characterize. In *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508 (7th Cir.1986), the court upheld the verdict of intentional discrimination, finding the case basically a "swearing contest," *id.* at 514, and then upheld the award of punitive damages, but only after characterizing it as "a close case," *id.* Unless there was a higher standard for punitive damages, it is hard to see why that case was "close" and the liability issue not. But in *Williamson v. Handy Button Machine Co.,* 817 F.2d 1290 (7th Cir.1987), the court appeared to say that punitive damages were available for racial discrimination under § 1981 so long as "the application of the law to the facts at hand was so clear at the time of the act that reasonably competent people would have agreed on its application." *Id.* at 1296. The position is not unlike that of the panel here, which likewise makes limited allowance for a defendant's mistake on an obscure issue of law. It may be more precise, however, to describe 7th Circuit law as in flux; as noted above, *Emmel v. Coca–Cola Bottling,* 95 F.3d 627, 636 (7th Cir.1996), says that an award of punitive damages under § 1981a itself must surmount a "higher hur-

2. Section 1981 prohibits discrimination on the basis of race in the making and enforcement of contracts. In the employment context, it overlaps substantially with Title VII, but the two differ in important respects (e.g., § 1981 applies only to racial discrimination while Title VII covers sex discrimination as well). Until 1991 one of the most important differences was the availability of compensatory and punitive damages under § 1981 but not under Title VII, a difference that made juries available for the former but not the latter. The Civil Rights Act of 1991 brings these two discrimination statutes closer together, but they remain distinct. For example, punitive damage claims under Title VII are capped, while those under § 1981 are not.

dle" than mere proof of intentional discrimination.

* * *

With this background in hand, I return to the legislative history of § 1981a. I have already noted the language of the House Report asserting that § 1981a demands of plaintiff "an even higher standard" than simple proof of intentional discrimination. See *supra* p. 1441 above. The panel quotes what appear as contradictory glosses on § 1981a urged by a senator and a representative. While Senator Dole said for himself and others that plaintiffs can recover for punitive damages only in "extraordinarily egregious cases," see 137 Cong. Rec. S 15473 (Oct. 30, 1991) (Interp. Memo of Sen. Dole et al.), Representative Edwards said that "[p]unitive damages are available under [§ 1981a] to the same extent and under the same standards that they are available to plaintiffs under 42 U.S.C. § 1981." See 137 Cong. Rec. H 9527 (Nov. 7, 1991) (Interp. Memo of Rep. Edwards). Compare Maj. Op. at 1437–38.

It is not clear to me that these views are in conflict. In light of the circuit split, Representative Edwards's comment is indeterminate. For those circuits that have required "egregious" discrimination in the § 1981 context, the two observations fit handily. Of course Representative Edwards's remark may be said to invite us to follow *our* own view of the law derived from § 1981. But that approach seems unduly self-referential. We can reconcile the otherwise disparate items of legislative history (the House Report and the Edwards and Dole statements) by following the courts that have, in applying § 1981, followed the current common law trend that, as to intentional torts, demands for punitive damages something substantially more blameworthy than the intention required for liability. This approach would also avoid creating a split with all the circuits that have addressed the § 1981a issue.

Because I agree with the panel that the parties agreed to have liability tried to the jury, *id.* at 1439–40, I do not dissent from the view that the jury verdict was binding as to liability. But the remand to the district court should not, in my view, include any direction to hold a trial on punitive damages.

Before: EDWARDS, Chief Judge, WALD, SILBERMAN, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL and GARLAND,* Circuit Judges.

ORDER

May 28, 1997

PER CURIAM.

The suggestion for rehearing *in banc* of the American Dental Association has been circulated to the full court. The taking of a vote was requested. Thereafter, a majority of the judges of the court in regular, active service voted in favor of the suggestion insofar as it pertains to the issue of punitive damages. Accordingly, it is

ORDERED that this matter will be reheard by the court sitting *in banc*. It is

FURTHER ORDERED that the judgment of the court filed on March 21, 1997, is vacated as to the issue of punitive damages.

A future order will govern further proceedings.

* Circuit Judge Garland did not participate in this order.