Jose A. HERNANDEZ–TIRADO,
Plaintiff, Appellee,

v.

Mariano ARTAU, etc.,
Defendant, Appellant.

No. 88–1595.

United States Court of Appeals,
First Circuit.

Heard Feb. 10, 1989.

Decided May 15, 1989.

Luis N. Blanco Matos, Federal Litigation Div., Dept. of Justice, with whom Rafael Ortiz Carrion, Sol. Gen., and Norma Cotti Cruz, Deputy Sol. Gen., Ponce, P.R., were on brief, for defendant, appellant.

Zulma R. Rosario, San Juan, P.R., for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

After the Popular Democratic Party (PDP) won Puerto Rico's 1984 gubernatorial election, the defendant, Mariano Artau, became Administrator of the Horse Racing Industry and Sports Administration. In September 1985 he removed plaintiff, Jose Hernandez Tirado, from his position of director of the Vocational Horse Racing School, a training school for professional jockeys. He demoted Hernandez to "executive officer," a position at the level of deputy or assistant director, and later appointed him "chief of general services" of the school. (The demotion involved a pay cut from about $1,300/month to $800/month.) Hernandez, a member of the New Progressive Party (NPP), claims that Artau demoted him because of his political affiliation, in violation of the First Amendment. *See Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980) (political firing unlawful unless political loyalty is an appropriate job requirement); *Elrod v. Burns,* 427 U.S. 347, 372–73, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (political firing violates First Amendment except in policymaking positions).

In a previous opinion, we examined the duties of the school director. *Hernandez–Tirado v. Artau,* 835 F.2d 377 (1st Cir. 1987). We held that the job was technical enough to qualify for First Amendment protection, *see Mendez–Palou v. Rohena–Betancourt,* 813 F.2d 1255, 1259 (1st Cir. 1987); and we held that Artau did not enjoy "qualified immunity" from liability for damages. *Hernandez–Tirado,* 835 F.2d at 378–79. Subsequently, the district court, sitting as a trier of fact, found that Artau did indeed dismiss Hernandez for political reasons. The court awarded both compensatory and punitive damages, and it also ordered reinstatement with back pay. Artau appeals.

■ 1. Artau first claims that the evidence was not sufficient to permit a finding that he demoted Hernandez for political reasons. The issue is a fairly close one, but we believe the evidence was adequate. On the one hand, Artau points out that his department was not one in which the change of party administration was followed by dismissal of significant numbers of NPP members. To the contrary, NPP members continued to serve in many high-level positions. For example, Artau retained several NPP members who held sensitive "trust" positions, including a racetrack supervisor and the head of the laboratory where race horses were tested for drugs. And, when the laboratory head eventually resigned, Artau appointed another NPP member to that post. He also retained a NPP member in the second-highest position in the financing department of the racing administration. Finally, of the five school directors appointed after Hernandez, one was an NPP member and another belonged to the Pro–Independence Party. The record indicates that Artau demoted, at most, two NPP members including Hernandez. (Hernandez claimed that Nydia Casanova, confidential secretary to the former Administrator, was also demoted; Artau said, however, that he transferred her to a career secretarial position with a higher salary.) And, Artau demoted Hernandez only after he had been in office eight months.

Artau adds that he had good, independent reasons for dismissing the school director. He says he and Hernandez disagreed about important matters of policy. Hernandez, because many of the school's students were drop-outs from regular schools, wished to emphasize general high school level education, which might better equip the students for life even if they did not become jockeys; but Artau thought the school should simply concentrate on teaching riding and horse racing. Artau also

points out that Hernandez, who came to the school from a background in teaching and personnel work, had no prior experience with horse racing or riding.

On the other hand, the record contains considerable evidence that the staff of the school thought Hernandez had done an excellent job. It also shows that Artau had very poor luck with Hernandez' replacements, for he hired and dismissed four different directors between Hernandez' demotion and the time of trial. It shows that Hernandez was a very active member of the NPP. And, most important, it contains evidence that, at the time he demoted Hernandez, Artau never mentioned the politically neutral reasons (policy disagreement and inexperience), but that he made statements showing a political motive. Marilyn Cordero Diaz, an English teacher at the school, and a PDP member, testified that Artau

> on one occasion, at a meeting, when we were together in his office, told me that Mr. Hernandez belonged to the New Progressive Party—actively belonged to that party, and that he was brought into the agency, in order to work in a political campaign.

She then said that Artau said he was "moving" or "transferring" Hernandez and Nydia Casanova

> because the Secretary of Justice had so ordered, but that he was very much satisfied with the work that both employees were performing.

In addition, Hernandez himself testified that Artau

> told me that he had to remove me because he was being pressured from above.

Although Artau says Hernandez conceded, on cross-examination, that Artau removed him simply because he did not like him, what Hernandez actually said was that Artau removed him "[b]ecause he didn't like me and I belong to the New Progressive Party." Artau denied making any of these statements.

The district court was free to believe the testimony of Cordero and Hernandez, and disbelieve Artau's contrary testimony. *See*

*Scarpa v. Murphy*, 806 F.2d 326, 328 (1st Cir.1986) ("Findings based on witness credibility are lodged firmly in the province of the trial court, and we are loathe to disturb them absent a compelling showing of error"). And that testimony, read in light of the rest of the record, supports the court's finding of political dismissal. That is, the court could properly conclude that Hernandez had shown that his "affiliation with the NPP was the substantial or motivating factor" underlying his demotion, *Kauffman v. Puerto Rico Telephone Co.*, 841 F.2d 1169, 1172 (1st Cir.1988), and that, but for his NPP affiliation, Artau would not have taken action against him, *see Kercado–Melendez v. Aponte–Roque*, 829 F.2d 255, 264 (1st Cir.1987) ("We cannot uphold the verdict unless the trial court correctly found that [the plaintiff] would not have been dismissed 'but for' her political affiliation").

■ 2. Artau argues that the record does not support the district court's award of punitive damages. We think he is correct. The Supreme Court has made clear that a jury "may" award punitive damages where a defendant has shown "reckless or callous indifference to the federally protected rights of others" as well as when his conduct is "motivated by evil motive or intent." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); *see also Germany v. Vance*, 868 F.2d 9, 20, 22 (1st Cir.1989) (because § 1983 liability itself requires at least reckless conduct, the "threshold" level of culpability for punitive damages is the same as that required for compensatory damages in § 1983 actions). But, in so holding, the Supreme Court did not say that the fact finder can award punitive damages in every single § 1983 action that *does* involve an intentional tort. Instead, the Court was simply rejecting the claim that *lack* of intent to cause harm automatically bars punitive damages. *See Rowlett v. Anheuser–Busch, Inc.*, 832 F.2d 194, 205 (1st Cir.1987) (in the case of intentional torts, "the state of mind necessary to trigger liability for the wrong is at least as culpable as that required to make punitive damages applicable" but "[t]hat does not

mean that punitive damages are appropriate in every case of an intentional wrong"). *See also Clark v. Taylor,* 710 F.2d 4, 14 (1st Cir.1983) ("punitive damages" appropriate where defendants, in permitting a dangerous substance to be placed on plaintiff's skin without warning, showed "reckless indifference to plaintiff's constitutional rights"). To the contrary, the Supreme Court listed the special circumstances in the case before it that made the punitive damage award proper. *Smith,* 461 U.S. at 50–51, 103 S.Ct. at 1637 (the case involved a strict standard for liability; the jury was required to find 'physical abuse of such base inhumane and barbaric proportions as to shock the sensibilities,' such that the defendant was guilty of 'a callous indifference or a thoughtless disregard for the consequences' of his actions). *See also Clark, supra.* The Supreme Court, in articulating the standard for punitive damages in § 1983 actions, also referred to common law standards using such terms as "injury ... inflicted maliciously or wantonly," "criminal indifference to civil obligations," *id.* at 41, 103 S.Ct. at 1632 (quoting *Philadelphia, W. & B.R. Co. v. Quigley,* 62 U.S. (21 How.) 202, 214, 16 L.Ed. 73 (1859)), "wilful misconduct" or "conscious indifference to consequences," *id.* 461 U.S. at 42–43, 103 S.Ct. at 1633 (quoting *Milwaukee & St. Paul R. Co. v. Arms,* 91 U.S. 489, 495, 23 L.Ed. 374 (1876)), and "outrageous conduct," *id.* 461 U.S. at 54, 103 S.Ct. at 1639 (quoting Restatement (Second) of Torts § 908(1) (1979)). And, the Supreme Court specifically wrote that the focus of the punitive damages inquiry

> is on the character of the tortfeasor's conduct—whether it is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards. *If it is of such a character,* then it is appropriate to allow a jury to assess punitive damages.

*Id.* at 54, 103 S.Ct. at 1639 (emphasis added). Thus, neither the common law, nor the Supreme Court in *Smith,* allows a jury to assess punitive damages in every single instance where it finds an intentional tort; rather, they require conduct that is "outrageous", either because of a person's "evil

motive" or because of his "reckless indifference" to the rights of others. *See Smith,* 461 U.S. at 56, 103 S.Ct. at 1640.

For this reason, several circuit courts have held that punitive damages awards were not proper in some cases where defendants' intentional acts violated § 1983. *See, e.g., Ivey v. Wilson,* 832 F.2d 950, 956 (6th Cir.1987) (although prison officials' acts violated prisoner's due process rights and gave rise to § 1983 liability, punitive damages award was improper because there was no evidence that defendants "were acting in bad faith" or "harbored any ill will" towards plaintiff); *Walters v. City of Atlanta,* 803 F.2d 1135, 1147 (11th Cir.1986) (upholding jury's finding that "defendants were responsible for the racial discrimination" plaintiff suffered, but vacating punitive damages award because the record did not show that defendants "acted with either the requisite ill will or callous disregard of [plaintiff's] federally protected rights"); *Lavicky v. Burnett,* 758 F.2d 468, 477 (10th Cir.1985) (unlawful search and seizure, and taking plaintiff's property without a hearing, gave rise to § 1983 liability, but punitive damages award was properly set aside because "there was no evidence of malice, wantonness or oppressiveness"); *Soderbeck v. Burnett County, Wis.,* 752 F.2d 285, 289 (7th Cir.1985) (plaintiff's showing of political dismissal was sufficient for compensatory damages, but not punitive damages).

If one accepts the proposition that not every case involving an intentional tort calls for punitive damages, that punitive damages are reserved for instances where the defendant's conduct is "of the sort that calls for deterrence and punishment over and above that provided by compensatory awards," *Smith,* 461 U.S. at 54, 103 S.Ct. at 1639, then punitive damages cannot be assessed in this case. The conduct at issue, demoting an official, is not like an assault or the beating of a prisoner, or retaliation for the content of an employee's speech, *see Fishman v. Clancy,* 763 F.2d 485 (1st Cir.1985). It is not *obviously* the kind of conduct that society normally will not tolerate; rather, it is conduct that

sometimes is lawful and sometimes is not, depending on a complex set of legal rules related to the nature of the particular official's duties—rules that a particular defendant might, or might not, actually understand. As we have previously pointed out, the practice of replacing policy-making officials when the voters elect a new administration is common in public life. The President of the United States, for example, may

> replace at will United States attorneys, regional heads of the General Services Administration, up to 10 percent of the top agency Senior Executive Services positions, and many other holders of significant offices.

*Juarbe–Angueira v. Arias,* 831 F.2d 11, 14 (1st Cir.1987). Moreover, Puerto Rico's civil service system does not seem to permit massive dismissal of career civil servants:

> Commonwealth law permits the Central Office of Personnel Administration to exempt not more than 25 positions per agency from the career system, using as criteria whether the job involves "formulation of public policy" ... or "[d]irect services to the head or subhead of the agency which require a high degree of personal trust." ... [Approximately 2.5% or about 3,700 employees] out of 162,387 [public employees] are in the "trust" or "confidence" service (of which the new Commonwealth government says *it has dismissed or demoted approximately 600,* and, of these, 319 have brought suit).

*Id.* (Emphasis added.)

In this case, Hernandez held a "trust" position, a classification that typically, but not invariably, means that a newly elected administration has the right to use political criteria in filling the position. It is difficult to say that dismissing the head of the School, the holder of a "trust" position, was an "outrageous" act, since there is no convincing evidence that Artau *actually knew* that Hernandez had a federally protected right to his job. Artau was not a lawyer. Artau may have thought, erroneously, that he had the legal right to demote Hernandez for political reasons; the record

does not show that he *knew* the demotion would violate Hernandez' First Amendment rights, but went ahead anyway. Although Artau's dismissal of Hernandez was an "intentional" tort, the dismissal was negligent in respect to the existence of a federally protected right. This "negligence" is sufficient for purposes of liability for damages. *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982) (officials "shielded from liability" for damages only "insofar as their conduct does not violate clearly established ... constitutional rights of which *a reasonable person* would have known;" "a reasonably competent public official *should* know the law governing his conduct"); *Hernandez–Tirado,* 835 F.2d at 378–79 (that Hernandez' job did not potentially concern matters of partisan political interest "ought to have been apparent" (not "was apparent") to Artau). Artau *should* have known that his conduct was wrongful; but, in the context of conduct that is not, on its face, obviously wrongful, that is insufficient to justify the punitive damages award.

The Seventh Circuit, applying the *Smith* test to a political dismissal case, explained that:

> The words used to mark off the domain of punitive damages—words like "maliciously," "wantonly," "oppressively," "spitefully"—indicate that punitive damages ... are reserved for cases where the wrongfulness of the defendant's conduct is conspicuous, implying that its wrongfulness is apparent to the person who engages in it, not just to a lawyer..... We may therefore set it down as a condition of awarding punitive damages that the defendant almost certainly knew that what he was doing was wrongful and subject to punishment....
>
> But the discharge of public employees on political grounds is not yet regarded in the light of something contrary to natural law; nor is it widely known in nonlegal circles to be a ... tort.... [If the defendant] had consulted a lawyer, he might well have been told that he could fire [the plaintiff] because she was a confidential employee; it was an argua-

ble point, though one ... resolved against him.

*Soderbeck,* 752 F.2d at 291; *see also Lavicky,* 758 F.2d at 477 (although "defendants should have realized that they were violating [plaintiff's] Fourth, Fifth, and Fourteenth Amendment rights," they "cannot be held for punitive damages simply because they did not know the rules of conduct they should follow. Simple ignorance of the applicable legal rules, even arrogant ignorance, does not by itself indicate reckless or callous indifference to federally protected rights").

For another thing, Artau did not engage in any widespread political "purge" of the agency; he maintained many other NPP members in high-ranking positions. And, the very evidence by which Hernandez sought to show that Artau's action was politically motivated suggests that Artau did not decide on his own to demote Hernandez, but he did so because of pressure "from above."

Finally, contrary to Hernandez' argument on appeal, we can find no evidence in the record that Artau intended to humiliate Hernandez. Hernandez says in his brief that he was left without any duties to perform, but the record shows that, after he was demoted, he was left without an assignment for no more than nineteen days (September 22, 1985 to October 11, 1985). Hernandez says in his brief that he was not given the keys he needed for his new job. His specific testimony was that

> I didn't have any keys, neither to the official vehicles nor to the agency; but I was responsible, should anything remain open, or should anything happen to the vehicles, should anyone take them away, I was responsible for that.

> .    .    .    .    .

> ... there is a switchboard where, at 4:30, the lights are turned off, that key was never given to me. There were times when the lights remained on and then I would be penalized for that.

This testimony, however, does not show that Artau intentionally deprived him of the keys, that being without keys was some sort of humiliation, or even that it

was Artau's responsibility, and not someone else's responsibility, to give him the keys.

Hernandez says that he was forced to clean toilets and perform other demeaning work. He testified that:

> The area of General Services see[s] to it that the facilities are clean when the agency is going to close down for the day, to designate someone to turn out the lights. It is in charge of the official vehicles and an area which is the workhouse for materials, and there is a person in charge of the warehouse and there is another area, which is the property area.

> .    .    .    .    .

> ... in the cleaning area, that's the area in which I practically had to mop the floors, also, because the people that I have under my supervision, are people who are elderly. Whom I cannot order to go up, on that table and wipe, clean that glass, because they might fall.

> .    .    .    .    .

> Well, I have had to unplug toilets. I have had to clean the walls. And I have had to pull the grasses on the surrounding areas. And whenever the students ... upon them seeing me perform this type of work, well, I would feel bad. I would feel bad, because that was not the type of work I was used to perform.

> .    .    .    .    .

This evidence (and it is virtually all the evidence on the point) shows that Hernandez was assigned to be head of general services; that he supervised persons *who* cleaned the school's buildings and grounds; that some of these persons were elderly, so he helped them clean up or cleaned up for them; and that he felt humiliated. In light of the first and middle paragraphs, we cannot read the last paragraph to say that Artau gave Hernandez what was essentially a "grass-pulling" or "toilet unplugging" job. This testimony is all the evidence on this matter that the record contains. It cannot reasonably be read to show that Artau (who, in another context, the court called a "very dear figure in the communi-

ty," one well liked by "people of all ideologies") was trying to humiliate Hernandez, or that Artau's assigning him to this position was unreasonable in light of other positions available at the time. The district court said that it was "able to perceive from [Hernandez'] demeanor, the intense suffering that he experienced as a result of this particular personnel action" and that Hernandez "was subjected to humiliation." But, even if Hernandez suffered from the demotion, in our view, for all the reasons stated, the record does not provide an adequate basis for the court to conclude that Artau's conduct, in bringing this about, was "of the sort that calls for deterrence and punishment over and above that provided by compensatory [damage] awards." *Smith,* 461 U.S. at 54, 103 S.Ct. at 1639.

■ 3. Artau argues that the court's award of back pay, an award he says was made against him in his "official" capacity, is legally improper because the Constitution's Eleventh Amendment prohibits a federal court from awarding damages against a state. *See Edelman v. Jordan,* 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974) ("a federal court's remedial power ... may not include a retroactive award which requires the payment of funds from the state treasury"); *Ezratty v. Commonwealth of Puerto Rico,* 648 F.2d 770, 776 n. 7 (1st Cir.1981) (Eleventh Amendment immunity applies to Puerto Rico). As the Supreme Court pointed out in *Edelman*

> While the Court of Appeals described this retroactive award of monetary relief as a form of "equitable restitution," it is in practical effect indistinguishable in many aspects from an award of damages against the State. It will to a virtual certainty be paid from state funds, and not from the pockets of the individual state officials who were the defendants in the action.

*Id.,* 415 U.S. at 668, 94 S.Ct. at 1358; *see also Quern v. Jordan,* 440 U.S. 332, 337–38 & n. 6, 99 S.Ct. 1139, 1143–44 & n. 6, 59 L.Ed.2d 358 (1979) (distinguishing prospective relief that has the "ancillary effect on the state treasury" that compliance will require spending state funds, which is permissible under the Eleventh Amendment,

from compensation for past wrongs, paid from the state treasury, which is barred under *Edelman* ); *Echevarria–Gonzalez v. Gonzalez–Chapel,* 849 F.2d 24, 32 (1st Cir. 1988) (a back pay award "is plainly retroactive relief requiring the payment of funds from the state treasury" and is barred by the Eleventh Amendment).

Hernandez responds that the Eleventh Amendment does not apply, because the Vocational Horse Racing School is not part of the Commonwealth government. Hernandez points out that the school's funds come from a special tax on horse racing prizes. *See* 13 L.P.R.A. §§ 4011(b), 4044A (1976) (tax on horse race prizes); 15 L.P. R.A. § 187(9) (Supp.1987) (funding for the School). He argues that it is like the local school board in *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), which the Supreme Court said fell outside the Eleventh Amendment's protection because it was "more like a county or city than it is like an arm of the state." *Id.* at 280, 97 S.Ct. at 573.

In our view, however, the school's special funding statute cannot make the legal difference for which Hernandez argues. The school board in *Mt. Healthy* had "extensive powers to issue bonds ... and to levy taxes," *id.,* 429 U.S. at 280, 97 S.Ct. at 573. It was classified as a "political subdivision" by one Ohio statute, and another Ohio statute said that the "State" of Ohio does not include such "political subdivisions." *Id.* Here, Puerto Rico's statutes make clear that the Commonwealth, not the school, has the sole power to raise the school's funds through taxes. And, the Puerto Rico statute creating the school does so by giving the Racing Administrator, who in turn is appointed by the Governor, the power to "establish and supervise" the school and promulgate rules for its operation. 15 L.P. R.A. § 187(9). Thus, the statute creates the school as an arm of the Commonwealth, not an independent body analogous to a municipality, *see Mt. Healthy,* 429 U.S. at 280, 97 S.Ct. at 572, nor, *a fortiori,* does it give the school the political or fiscal autonomy that would make it independent

of the Commonwealth for Eleventh Amendment purposes. *See Figureroa–Rodriguez v. Aquino,* 863 F.2d 1037, 1044 (1st Cir. 1988); *Ainsworth Aristocrat Intern. Pty. v. Tourism Co.,* 818 F.2d 1034, 1037 (1st Cir.1987).

■ Hernandez also argues that the Commonwealth has waived its Eleventh Amendment immunity by providing for back pay as an administrative remedy. The relevant statute says that, when the board of appeals of the Personnel Administration finds that an employee was wrongfully fired,

> it shall order his reinstatement to his position or to a similar one. Likewise it shall order the total or partial payment of the salaries which he failed to receive from the effective date of the removal.

3 L.P.R.A. § 1397(2) (1978). But this statute does not say or even imply that Puerto Rico waives its immunity to suit in *federal* court; it only governs administrative awards by a Commonwealth agency. Since the statute does not explicitly refer to suits in federal court, it does not constitute a waiver of Eleventh Amendment immunity. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 3146, 87 L.Ed. 2d 171 (1985) (a waiver of Eleventh Amendment immunity must specify the state's intent to submit itself to suit in *federal* court); *Edelman,* 415 U.S. at 673, 94 S.Ct. at 1361 (Eleventh Amendment protection can only be waived by "express language" or by "overwhelming implications").

For these reasons, we conclude that the court cannot award Hernandez back pay against Artau in his official capacity, an award that would come from the Commonwealth's treasury. But, that same sum—the difference between what Hernandez actually earned in his lower position and what he would have earned had he remained director of the school—is still an element of Hernandez' compensatory damages. And, as an element of damages, the court may award it against Artau in his personal capacity. *See Figueroa-Rodriguez,* 863 F.2d at 1043 n. 7 (although, by definition, "back pay" must be paid by the employer and therefore cannot be awarded against a defendant in his "individual capacity," still, the individual defendant "may be liable for compensatory damages in the same amount"). We cannot be sure, from the district court's opinion, whether or not it has already included lost wages in its award of compensatory damages. (If it did so, of course, its "back pay" award would have amounted to double counting.) We therefore remand this case for any recalculation of damages necessary to account for lost wages in the compensatory damages award.

*The judgment of liability is affirmed. The remainder of the judgment is vacated and the case is remanded for further proceedings in accordance with this opinion.*

LEVIN H. CAMPBELL, Chief Judge (dubitante).

While I join the court's decision, I have doubts as to its disposition of the issue of punitive damages on the particular facts at hand. I want to make clear that I fully agree with Judge Breyer's excellent discussion, for the court, of the *standards* for imposing punitive damages; I am just not as certain as my colleagues that, under those standards, Artau's conduct could not permissibly be found by the lower court to be so outrageous as to justify punitive damages.

We must, of course, accord deference to the district court as the finder of fact, especially in regard to assessments of credibility. My colleagues, it seems to me, do not in all respects accept the facts and inferences as the district court could permissibly have viewed them. On the disputed evidence here, the lower court was entitled to conclude that this was a wholly and obviously unwarranted political demotion, involving a job (running a school for jockeys) that had no conceivable relevance to partisan political concerns.

Given such a conclusion, I am dubious about my colleagues' proposition that Artau's conduct was "not *obviously* the kind of conduct that society normally will not tolerate." *See* page 869, *supra.* Neither am I certain that this was the sort of political act that "is not yet regarded in the

light of something contrary to natural law," page 870, *supra* (quoting *Soderbeck v. Burnett County*, 752 F.2d at 291). To the contrary, many people—perhaps most—would regard the sending of a capable director of a school of this type out to pasture solely because he belonged to the "wrong" political party as a cynical, winner take all, and morally repugnant act of political patronage. Several of the witnesses testifying in plaintiff's favor belonged to defendant Artau's own political party— some indication that what occurred here was perceived as going well beyond the line of acceptable partisanship. In the terms used by the Supreme Court in *Smith v. Wade*, 461 U.S. at 51, 103 S.Ct. at 1637, such an act would be one that smacks of "reckless or callous disregard for the plaintiff's rights." Although Artau was "not a lawyer," as the court notes, page 870, *supra*, one does not need a law degree to known that certain forms of conduct are *wrong*.

To be sure, a political demotion is less overtly sadistic than beating a prisoner. But as we have held, First Amendment violations are not exempt from punitive damages. *Fishman v. Clancy*, 763 F.2d at 489. Judge Coffin's remarks in *Fishman* seem relevant in the present case:

> Defendants seem to suggest that retaliatory dismissals for exercise of First Amendment rights would rarely, if ever, justify punitive damages. We think this attitude belittles the First Amendment. It is more appropriate to consider whether defendants' conduct amounted to an outrageous violation of First Amendment rights than to consider whether it was outrageous when compared with the actions of a police officer who brutally beat and illegally arrested a man.

*Id.* at 489.

My colleagues believe that Artau's conduct was not "outrageous" enough to justify punitive damages. I agree that outrage is the proper consideration. And if they were sitting in the district court, they might not have found outrageous conduct. But "outrage" in matters like this is hard to dissociate from the factfinder's perception of what really occurred, of the motives at work and the values involved. The Supreme Court says the factfinder exercises the "discretionary moral judgment," *Smith v. Wade*, 461 U.S. at 52, 103 S.Ct. at 1638, of the community. This is not to say there may not be ordinary political firing situations so lacking in any basis for punitive damages that an appellate court must reverse. *See, e.g., Marin–Piazza v. Aponte– Roque*, 873 F.2d 432, (1st Cir.1989). But I am not persuaded that the present case presents such a situation.

The district court judge made clear that he was outraged by what he viewed as "a malicious, wanton, oppressive act ..., done knowingly, to punish a person because of his political affiliation." The judge's outrage was perhaps fanned by what he viewed as Artau's lack of candor on the witness stand. (In the words of appellant's own brief, the judge "stopp[ed] just short of calling the defendant an outright liar.") And the judge explained that he was imposing punitive damages not simply to punish the wrongdoer, but also to serve as an example to the community. He stated:

> [W]e are going to grant punitive damages against Mr. Artau in the amount of ... 15 thousand dollars for that to serve as an example, that we in this jurisdiction should put an end to this political back and forth bickering that is killing the very roots, the very roots of organized social life....

Such exemplary purposes have long been an accepted reason for imposing punitive damages. As the Court noted in *Smith v. Wade*, 461 U.S. at 54, 103 S.Ct. at 1639, "Punitive damages are awarded in the jury's discretion 'to punish [the defendant] for his outrageous conduct *and to deter him and others like him from similar conduct in the future*'" (citing *Restatement (Second) of Torts* § 908(1) (1979)) (emphasis added).

While the question is close, I believe the record will support findings and inferences sufficient for the district court to have awarded punitive damages under the principles set out in our opinion.